Case 1:22-cv-01153-RDA-WBP Document 55-1 Filed 03/18/24 Page 1 of 8 PageID# 399
Case 1:24-cv-00880-PTG-ERV Document 1-1 Filed 05/24/24 Page 1 of 52 PageID# 9
Case 1:22-cv-01153-RDA-WBP Document 39-1 Filed 10/27/23 Page 1 of 8 PageID# 266

# Amended Facts

## Concise statement of chronological FACTS

Plaintiff has received medical treatment for a disability that restricts her ability to communicate and specifically impairs her use of vocal speech. She has medical documentation, records of medical treatment. However, even if you didn't know about this medical data beforehand, you would quickly realize, just as the Defendant did when it hired Plaintiff, that Plaintiff's vocal speech is impaired.

Perhaps if one were unaware, they might assume that Plaintiff can't write well because she can't speak well, or they might sense something 'off' or 'awkward' about her. They might say she has 'mental problems'. Alternatively, if one were more precise, they might say it can be difficult to communicate with her because at times Plaintiff experiences noticeable difficulty using vocal speech. It is plain for others to sense through sound or sight. I couldn't hide this even if I wanted to.

Defendant hired Plaintiff as a specific type of technology professional. Plaintiff holds two industry-level certifications specific to the technology ("The Platform") that she was hired for. Plaintiff holds a graduate degree in Information Systems, a degree that is meant to prepare individuals for technology roles, specifically software development. Plaintiff additionally holds an academic certification in the Platform's software partner for location and data services. Plaintiff also holds both, an industry-level certification and an academic certification, in cybersecurity, a topic intertwined deeply with software development jobs. Plaintiff also had previous experience as a consultant working with various forms of technology and software. Plaintiff also tutored students in software tools when Plaintiff was a student herself. Also while Plaintiff was a student, she participated in academic sports, qualifying through performance in a regional competition of internet technology.

Plaintiff was employed by the defendant from July 2020 until November 2021. Plaintiff's essential work duties were: operation of computers, operation of computer applications, long periods of sitting or standing in the same place, documenting software use cases with written communication based on verbal or written inquiries, writing code to supplement existing software applications, writing tests for the software applications, creating visuals explaining software applications, communicating about Plaintiff's work, collaborating with others, willingness to learn new programming languages and accept tasks about it, and a willingness to relocate anywhere in the contiguous US for a permanent employment opportunity.

Plaintiff's first phase of employment with Defendant was "training", occurring approximately between July 2020 and September 2020. Defendant's "training" exposed a group of employees to a wide range of information in a short amount of time. Approximately half of the people who started the training did not successfully complete the training, either leaving voluntarily or receiving separation notices. Early in the training, Defendant noticed that Plaintiff was partially using text to speak instead of vocal speech. Defendant told Plaintiff they would consider 100% text communication to mean that Plaintiff was unable to work in the field at all. This was told to

Plaintiff in an email. Around this same time, Plaintiff's manager said that Defendant was generally not great about accommodations.

Plaintiff continued the training partially using vocal speech and partially written speech, asking all questions in writing, instead of vocal speech. During training, Plaintiff also participated in scrum meetings with written word instead of vocal speech. It was known to peers and the manager staff that Plaintiff used a lot of text to communicate from the very beginning of Plaintiff's employment with Defendant.

After "training", Plaintiff went into "staging" between October 2020 and November 2020. During this time, Plaintiff still used text to communicate with peers in activities. Also during this time, Plaintiff asked and was granted permission from management to send status reports in writing, instead of using vocal speech.

From November 2020 through June 2021, Plaintiff was on "Project" with Defendant's client who assigned Plaintiff to a 1-year training period in preparation for a non-simulated client. Plaintiff emailed Plaintiff's client supervisor explaining she needed accommodations because of medical issues. Plaintiff used text to communicate 100% of the time between November 2020 and July 2021.

On or around April of 2021 Plaintiff received an email that she was recommended for a non-simulated client. She was so happy because this was ahead of the 1-year timeline. Plaintiff received her new assignment in the client's system and was waiting to be transferred when she received a message from someone requesting a meeting before she started the new role. Plaintiff explained she'd been using vocal speech to communicate 100% of the time because of a speech impairment and then the individual refused the meeting. She was subsequently removed from the non-simulating project, never having the opportunity to start.

Plaintiff was placed back onto the training project into the client's system before receiving notice of project termination in July of 2021. Before Plaintiff's last day with Defendant's client, "Respondent B" in Plaintiff's EEOC narrative, Plaintiff submitted a complaint about what she felt was discriminatory conduct. After receiving notice of project termination, the Defendant sent Plaintiff a document outlining expectations for transitioning back to the Defendant.

On July 26, 2021, after leaving the initial client, Plaintiff had an interview with an accenture team. This was a remote interview using internet tools like Zoom or Microsoft Teams. These tools have the chat function as a standard feature. Before the interview started with Accenture, one of Defendants agents, a person who Plaintiff had no prior interaction with, joined the call. Plaintiff explained she was using text to talk instead of vocal speech and this employee suggested that it would be impossible for Plaintiff to complete the interview, asking 'how do you expect to do the interview at all?

Plaintiff explained that anything that can be said with vocal speech can be said with written words and this is especially true for coding jobs. Plaintiff further explained she'd already



Case 1:22-cv-01153-RDA-WBP Document 55-1 Filed 07/18/24 Page 3 of 8 PageID# 401

contacted the person interviewing her and there was no problem with it from their end. The Accenture agent joined the call and Defendants agent left the call. The interview was scheduled for 30 minutes and it lasted 30 minutes or longer. The interviewer told Plaintiff that her experience matched what the client was looking for. Towards the end, the interviewer wanted to make sure Plaintiff was okay with a slightly altered schedule for every day work and Plaintiff said it was great.

On July 28th, 2021 Defendant learned that Plaintiff had reported what she felt was discrimination at the initial client. On July 29th, Defendant's manager reached out to Plaintiff and described Plaintiff's medical condition as a "problem", asking "how long you are gonna have this problem". At this point, Plaintiff asked if her disability was why she hadn't yet received a schedule but the manager did not answer. On July 30th, Plaintiff assured Defendant's HR that she could do her job. She even wrote Defendant a letter explaining all of the ways that she could do her job and how she hoped Defendant would consider the ways that Plaintiff's need to communicate primarily in writing was actually a strength. She also acknowledged the accommodation request challenged some deeply held communication stereotypes but also communicated it was inaccurate to hold vocal speech as the only effective way of collaborative communication for the work of her position.

On July 30, 2021, also Plaintiff wrote to Defendant's HR asking if she hadn't received a work schedule because of her disability. Plaintiff explicitly stated she was concerned because she understood the situation to be resulting in an entire week of lost pay as of that date.

On August 9th, when she still hadn't heard anything back from anyone in HR about the reasonable accommodation request, or her manager about day-to-day responsibilities, despite reaching out multiple times to both parties, she received a 'panel invite' at 3:40pm that was open until 5:00pm, so zero notice and only open for the last hour of the day. On August 10th, Plaintiff wrote back, with management and HR copied, explaining that she needed HR to address concerns with some reasonable level of resolve and acknowledgement and she felt this was abusive. Further explaining, just as it would be unacceptable for me to disregard my ethical and legal obligations, it is similarly unacceptable for Revature staff to ignore legal and ethical obligations.

A few hours later, that manager sent Plaintiff a message that her portfolio was rejected. According to Defendant's policies, the portfolio approval was necessary for client eligibility. So, it was critical for Plaintiff's job. It felt like the portfolio rejection was punishment for speaking out against management, especially because the purported reason for the rejection was something that had already been discussed. Even when Plaintiff changed the portfolio again, this manager never issued the approval and the portfolio remained unapproved throughout the remainder of Plaintiff's employment.

Because the portfolio approval was necessary for client eligibility, this really caused Plaintiff extreme distress. When Plaintiff continuously tried out to this manager, even inquiring that if email wasn't the best way to connect they could schedule a live session, the manager never



Case 1:22-cv-01153-RDA-WBP   Document 55-1   Filed 07/18/24   Page 4 of 8 PageID# 402
Case 1:24-cv-00880-PTG-LRV   Document 1-1   Filed 05/24/24   Page 4 of 52 PageID# 12
Case 1:22-cv-01153-RDA-WBP   Document 39-1   Filed 10/27/23   Page 4 of 8 PageID# 269

answered, just like the manager never answered Plaintiff when she reached out about day to day responsibilities. What's even worse is that email was the official method of communication per Defendant's policies. Another one of policies was that Defendant had decision making power over Plaintiff's projects, this may have meant that the 'interviews' were just formalities and it was Defendant who had total discretion over project placement, so it wasn't Plaintiff interviewing with a company who would decide if they would select her or not. The initial client had actually told Plaintiff she was removed from her project because of the Defendant.

Plaintiff ultimately reached out to HR about the portfolio rejection explaining she felt like her employment was threatened, that she felt like she was already fired because her manager wouldn't communicate with her, and that she was humiliated

On August 10th, Plaintiff wrote to HR about "abusive behavior", demanding acknowledgement and resolution. Finally on August 16th, the HR representative wrote to Plaintiff, except that it wasn't to discuss anything Plaintiff had written to her about, it was to inform Plaintiff that Defendant was aware she complained about discrimination at the initial client. . Plaintiff insisted her concerns be addressed before addressing a third party.

Despite several attempts on Plaintiff's part to follow up about this, the HR representative did not recognize Plaintiff's emails about the reasonable accommodation and complaints about her pay until August 23, 2021. This HR representative claimed all of my emails went to spam but if you know how spam works from a technical perspective, you would know that the emails did not go to spam.

Because Plaintiff's manager had also stopped responding to Plaintiff's direct communications after describing her disability as a problem, Plaintiff felt like she was already terminated. The fact that HR wouldn't even acknowledge her time sheets concerns made things worse. Usually Plaintiff would have been flooded with messages about requirements / meetings and time sheet submissions. All of this had stopped. I felt like I was being punished.

Although the hours between August 1 2021, and August 23, 2021 were eventually processed, it was only after HR confronted me about reporting discrimination at the previous client. Plaintiff initially reached out to HR about the hours on July 30th and followed up multiple times with no response until August 23, 2021. Nearly a month having gone by, I was feeling like they'd already terminated my employment. Additionally, I was never reimbursed for the hours for the week of July 26,2021. HR never acknowledged my concerns that I lost an entire week of pay that week. Defendant forced the use of all of my accrued time off because management had stopped communicating with me, didn't answer when I asked about day-to-day expectations, and HR also never acknowledged the issue even though I brought it up several times.

On August 23, 2021, Plaintiff explained to HR that she hadn't been submitting hours because the staff never answered Plaintiff's communications. On August 26, 2021, Plaintiff reiterated to HR that she felt "constructively discharged" because the staff had stopped answering her even

Case 1:22-cv-01153-RDA-WBP   Document 55-1   Filed 07/18/24   Page 5 of 8 PageID# 403
Case 1:24-cv-00880-PTG-LRV   Document 1-1   Filed 05/24/24   Page 5 of 52 PageID# 13
Case 1:22-cv-01153-RDA-WBP   Document 39-1   Filed 10/27/23   Page 5 of 8 PageID# 270

though she was consistently reaching out. During these communications with HR Plaintiff expressed that she was humiliated.

September 3, 2021, Plaintiff again reached out to HR explaining that she still had no work schedule, her portfolio remained unapproved, and she hadn't heard from anyone about the interactive discussion. The HR representative never answered this email.

On September 7th, I met with a new HR employee. When the meeting started, the new HR employee had no context for the meeting beyond that we were meeting to discuss a reasonable accommodation. I emailed this employee explaining the situation prior to the meeting but I think the previous HR person should have at least provided some context. It made things extra difficult having to basically start all over again, after more than a month of being ignored by essentially all staff members. Plaintiff specifically named Antony as her manager, explaining he'd stopped answering her communications and she felt it was because of the accommodation request. During this September 7th meeting, Plaintiff also this was causing her extreme distress and that she wanted to work but was being forced to leave. More than a month had gone by.

Plaintiff received complete reasonable accommodation forms for the first time on September 8, 2021, more than one month after the original request, and a month of being ignored by the entire staff.

On September 10, Still with no communication from Plaintiff's manager, or anything from anyone that resembled a work schedule, Plaintiff reached out to the HR representative she met with on September 7, asking if this employee would help Plaintiff get through to staff for a voucher to complete a technical certification exam, explaining she'd already reached out to management but there was no response.

The period of September 11 of September 23 was extremely stressful and it will force me to be re-stressed to an unhealthy level to resynthesize it here but I did outline this in the EEOC narrative which is attached.

On or around September 23, 2021, Plaintiff received a performance deficiency notice. The notice instructed her to participate or have a pay reduction. On September 23, 201 Plaintiff wrote to both management and HR explaining that she felt the performance notice was simply to intimidate or harass her because of the disability, expressing a lot of frustration. She explained that it was crazy-making behavior to concurrently (1) not answer her communications about participation and (2) tell her that she isn't participating. At this point, Defendants employees finally answered Plaintiff's communications about how to access the portal and Plaintiff connected to the portal where the so-called bench activities were.

On or around September 29th, 2021, Plaintiff received an email from Defendant indicating this was the last time Defendant would follow up with Plaintiff about the reasonable accommodation request. Plaintiff responded on or around September 29th, 2021, asking for the second time if Plaintiff could bring medical documentation in person also noting that Plaintiff wasn't

Case 1:22-cv-01153-RDA-WBP   Document 55-1   Filed 07/18/24   Page 6 of 8 PageID# 404
Case 1:24-cv-00880-PTG-LRV   Document 1-1   Filed 05/24/24   Page 6 of 52 PageID# 14
Case 1:22-cv-01153-RDA-WBP   Document 39-1   Filed 10/27/23   Page 6 of 8 PageID# 271

comfortable sharing more information until Plaintiff's complaints about hostility from management were addressed. Defendant responded to Plaintiff stating they'd be happy to resume the conversation at a later time, never acknowledging my complaints about management and never answering me about whether I could bring medical documentation in-peron.

The next business day, October 1st, 2021, Plaintiff's compensation was reduced 32 hours for the pay period of 9/20/21. This happened immediately after Plaintiff insisted that HR recognize Plaintiff's complaint about management, where Plaintiff had complained about being threatened and intimidated when HR and management were on the same email chain. Once Defendant finally answered Plaintiff about the bench activities, Plaintiff resumed immediately, that same day, so the punitive escalation of the pay reduction was out of congruency with what Plaintiff was told. Additionally, because of the way they had set up the bench activities, there was nothing that Plaintiff missed, some weeks literally all of the activities were optional. Perhaps the worst though was that even after Plaintiff got connected to slack, some activities were posted on a different platform that plaintiff still didn't have access to. As soon as I got the work schedule from management, I reached out about the slack link, it was the management who didn't answer me, causing the delay.

When I got the job description about the fidelity job around October 14, 2021, I was so happy because one of the outlined questions of interest was about different communication styles. It was so upsetting to subsequently have the call with Defendant's employee because this employee just wanted to ask about the previous client (the one I'd reported discrimination to), and didn't mention anything about the practice questions that were outlined.

I used a voice enhancer microphone during the call and the Defendant's employee commented on it, asking about my voice, and I asked if what I was saying was audible and if we could proceed. The meeting proceeded but Defendant's employee didn't address any of the practice questions sent with the job description. After the meeting, I wrote to the Defendant's employee trying to highlight that I was hoping we could practice the questions that were listed on the job description before I went to the actual interview. The employee wrote back that he was praying for me and I wouldn't be interviewing because I wasn't a good fit. This was totally non-responsive about the practice of the job description questions. How would he know I wasn't a good fit if I didn't even get an opportunity to answer the job description questions? This was October 15, 2021.

On or around November 1, 2021, The defendant didn't tell me the temp agency was the last opportunity they were going to share when they asked me if it was okay to share my portfolio. Plaintiff understood Defendant to be genuinely asking if Plaintiff was interested or not in the sub-contracted temp role because the Defendant asked Plaintiff if it was okay to share Plaintiff's portfolio. Previously Plaintiff had no say over who the portfolio was shared with. Because this was a change from how things were normally done, and the opportunity was so dramatically different from what Defendant previously offered, Plaintiff didn't understand the question to be an order to do an interview with a client.



6 of 8

Case 1:22-cv-01153-RDA-WBP   Document 55-1   Filed 07/18/24   Page 7 of 8 PageID# 405

The temp agency would not have resulted in additional hours. The hours would have been the same. The hourly wage itself would have been higher but not in the long-run. How long was this sub-contracted temp position? A week? A month? Defendant wouldn't even provide a minimal timeline. When this sub-contracted temp role ended the Defendant would have paid Plaintiff minimum wage and because this temp agency was out of Florida, the minimum wage was significantly lower than where Plaintiff was at the time, approximately 35% lower.

There was no housing assistance offered to me. 70% or more of my entire wage would have gone to housing because Defendant didn't provide a minimal timeline. I would have been forced into day-to-day rentals during the busiest and most expensive time of the year for short term rentals and hotels in Florida- Snowbird season.

As a sub-contracted temp, not even a full-stop temp, every day I would wonder, will I have a job tomorrow? Should I book another night to stay even though it will cost me nearly all of my wage? Who would this be acceptable for, a slave? If the Defendant paid or reimbursed for these excessive uncertainty costs then it wouldn't have been as detrimental but Plaintiff was expected to pay this.

When I think about the words "equal opportunity" when comparing a sub-contracted temp role with no timeline and a 1000 mile relocation, compared to a two-year development position intended to lead to a permanent position and is 1000 miles relocation, well these two are not equal in terms of stability, wage prediction, relationship building, and long-term career impact. These two positions are dramatically different employment opportunities.

The HR person who'd finally sent me the forms after more than a month, this person was copied on one of my termination emails, on or around November 1, 2021. The only interactions I had with her were the complaints about the total disengagement (the complaints that were never responded to) and the reasonable accommodation. so I'm not sure why she was on the termination email.

On or around November 1, when I had a final conversation with the manager who fired me, the same manager who described my disability as a problem before totally disengaging with me, this manager quoted a policy that I'd been on the so-called bench for 100 days on the bench but for two months so (60 of the 100 days) I was waiting in limbo without any type of schedule for work and my communications about day-to-day expectations went un unanswered from July 2021 until on or around September 15, nearly two months. So for more than half of that time I was excluded from daily participation which caused me extreme distress. One strange thing about their slack channel was that information would be restricted or hidden if it was a day or so old. On the slack channel some people talked about how their panel was all writing, like in the form of a multiple choice test. It made me feel even worse about the fact that they literally removed the chat box for me where it was before on mine. They used the word panel but this word was misleading because in some cases there wasn't even a live person, it was simply a



7 of 8

Case 1:22-cv-01153-RDA-WBP   Document 55-1   Filed 07/18/24   Page 8 of 8 PageID# 406
Case 1:24-cv-00880-PTG-LRV   Document 1-1   Filed 05/24/24   Page 8 of 52 PageID# 16
Case 1:22-cv-01153-RDA-WBP   Document 39-1   Filed 10/27/23   Page 8 of 8 PageID# 273

written test or a place where someone would record a video of themselves. In other instances, there was a live person. It didn't seem like there was a stable policy on how they were assigning the panels.

In 2022, Plaintiff filed a complaint with the EEOC who opened an investigation. However, Plaintiff did not prepare the charge's cover sheet where the check boxes are marked. After reviewing the cover sheet that was prepared by the EEOC member, Plaintiff told the EEOC representative that there was more to the complaint and the EEOC representative responded by telling Plaintiff not to worry because we could add more at a later time, further explaining this form was just to get things started. Plaintiff provided EEOC with documents that specifically articulated Plaintiff had experienced what she believed was "retaliation" and articulated the same for "interference". Plaintiff also asked the EEOC representative to review everything she provided and ask her questions based on the written material but the EEOC representative never asked any questions.

It was really difficult to answer what the Defendant provided to EEOC as a response because the document submitted by the attorneys contained false information. I don't think it is fair that they were allowed to present false information to the EEOC. It just made an already intimidating task, even worse. It also contained some embarrassing content that wasn't accurate and it felt like the only reason they included this was to humiliate me.

The Defendant also refused to participate in the EEOC mediation meeting which could have resulted in a resolution of this. I also reached out to the Defendant's attorneys multiple times explaining that I wanted to resolve this and would only file a lawsuit if necessary. I never heard back from them. This was all just so upsetting because I kept getting ads from them right after employment separation saying that they were hiring and training a bunch of people in the city I was in. I printed one of the pages.

By the end of 2022, Plaintiff filed this lawsuit as EEOC had issued a non-determination letter.

I enjoy working and would have done everything to continuously improve and contribute if I had a willing partner. I didn't have a willing partner in Defendant. Yes, there's a lot of people who would describe me as odd, but I am not unreasonable. It didn't even make sense that they were demanding I send medical documentation in email because company policy was that no sensitive information should be put in email. Also My behavior was coming from an informed and professional perspective based on the credentials I've earned. I was just following the rules.. It's also extremely devastating because the time right after one graduates, which is when I joined Defendant, is a special time where people are eligible for 'early career' roles. I was supposed to have mentoring and ongoing support throughout my career at Defendant but I didn't have any of that.

I recently found two reviews online about other people's experience with Defendant. One person having a similar experience to me with their employment threatened and the other person just noting that Defendant doesn't provide accommodations.



8 of 8