Case 1:22-cv-01153-RDA-WBP Document 55-2 Filed 07/18/24 Page 1 of 13 PageID# 497
Case 1:24-cv-00880-PTG-LRV Document 1-1 Filed 05/24/24 Page 9 of 52 PageID# 17
Case 1:22-cv-01153-RDA-WBP Document 39-2 Filed 10/27/23 Page 1 of 8 PageID# 274

# Amended Claims

## CLAIMS

1. Discriminatory Discharge

Plaintiff has received medical treatment for a disability that restricts her ability to communicate and specifically impairs her use of vocal speech. All before requesting a formal disability accommodation, Plaintiff graduated Defendant's training and completed work assignments from November 2020 until June 2021.. Plaintiff also earned two industry-level certifications on the subject matter of Plaintiff's work.

Plaintiff received a separation notice/ termination letter from Defendant in November of 2021. Plaintiff was attending all activities that she was asked to. Plaintiff didn't understand that Defendant expected her to interview for the sub-contracted temp role because this was presented to her in a way that was different from all other opportunities. Defendant asked her if it was okay to share her portfolio and previously plaintiff had no say or control over who the portfolio was shared with. A temp with no minimal timeline is also a dramatically different role than a 2 year development track leading to permanent employment. Plaintiff's job description was to be open to relocating for a permanent role. Plaintiff also did not have notice that this was the only remaining position Defendant was willing to consider her for.

Defendant didn't tell Plaintiff this until after the decision to terminate Plaintiff was already made. The manager who terminated her is the manager who essentially stopped all communication with her after describing her disability as a problem, ignored her communications about day-to-day responsibilities, required her to go through multiple so-called panels because of the audio even though Plaintiff had received notice that her first panel was successful. This manager said they were simply enforcing a policy on or around November 3,2021 that she be terminated because she'd been on the bench for 100 days or more, except that for 60 of those days plaintiff was blocked from all day to day activities. Plaintiff also found written stories from other employees about similar experience with Defendant and disabilities. Defendant was also looking to hire hundreds of employees the week after Plaintiff was terminated so it didn't make sense that there was no more work available.

2. Failure to accommodate

Plaintiff has received medical treatment for a disability that restricts her ability to communicate and specifically impairs her use of vocal speech. Plaintiff graduated Defendant's training and completed work assignments from November 2020 until June 2021. Plaintiff also earned two industry-level certifications on the subject matter of Plaintiff's work. All of this was before Plaintiff formally requested a reasonable accommodation.

Early in the training, between July 2020 and September 2020, Defendant's training employees noticed that Plaintiff's speech was stilted and that Plaintiff was partially using text to speak instead of vocal speech.Plaintiff continued the training partially using vocal speech and partially

written speech, asking all questions in writing, instead of vocal speech. During training, Plaintiff also participated in scrum meetings with written word instead of vocal speech. It was known to peers and the manager staff that Plaintiff used a lot of text to communicate from the very beginning of Plaintiff's employment with Defendant.

After "training", Plaintiff went into "staging", before going to the client, between October 2020 and November 2020. During this time, Plaintiff still used text to communicate with peers in activities. Also during this time, Plaintiff asked and was granted permission from management to send status reports in writing, instead of using vocal speech.

From November 2020 through June 2021, Plaintiff was on "Project" with Defendant's client who assigned Plaintiff to a 1-year training period in preparation for a non-simulated client. Plaintiff emailed Plaintiff's client supervisor explaining she needed accommodations because of medical issues. Plaintiff used text to communicate 100% of the time between November 2020 and September 2021.

In July of 2021, Plaintiff told Defendant she was experiencing continued difficulty using vocal speech.

In July of 2021 Plaintiff assured Defendant that she could do her job. She even wrote Defendant a letter explaining all of the ways that she could do her job and how she hoped Defendant would consider the ways that Plaintiff's need to communicate primarily in writing was actually a strength. She also acknowledged the accommodation request challenged some deeply held communication stereotypes but also communicated it was inaccurate to hold vocal speech as the only effective way of collaborative communication for the work of her position. I specifically asked for a place in writing on the panel, and that you specifically asked if the accommodation was why the panel was delayed (7/29, 7/30, 9/2), They weren't willing to have a conversation about it, all of my attempts to have a discussion were ignored.

The employer refused to include me in day-to-day work activities for almost 2 months after I requested an accommodation. They also removed the place for the text/chat feature where it existed previously for the panel assessment. Plaintiff asked the Defendant multiple times if she could bring medical documentation in person to support a reasonable accommodations request but the Defendant never answered her. The last time Plaintiff asked about this was October 1, 2021, one month before she was terminated.

Because of the statements made by Defendant when I first started, about being 100% unable to be worked using written word, and the way that Defendant totally disengaged with me after I shared reasonable accommodation information, combined with the fact that they 100% ignored multiple requests from me to bring the medical documentation in person, I think that they never wanted to have an interactive discussion in the first place.

The HR person would finally sent me the forms was copied on one of my termination emails, on or around November 1, 2021. The only interactions I had with her were the complaints about the total disengagement and the reasonable accommodation so I'm not sure why she was on the termination email.

3. Retaliation for complaining about discrimination resulting in deduction of compensation October 1, 2021

On or around September 23, 2021, Plaintiff received a performance deficiency notice. The notice instructed her to participate or have a pay reduction. On September 23, 201 Plaintiff wrote to both management and HR explaining that she felt the performance notice was simply to intimidate or harass her because of the disability, expressing a lot of frustration. She explained that it was crazy-making behavior to concurrently (1) not answer her communications about participation and (2) tell her that she isn't participating. At this point, Defendants employees finally answered Plaintiff's communications about how to access the portal and Plaintiff connected to the portal where the so-called bench activities were.

On or around September 29th, 2021, Plaintiff received an email from Defendant indicating this was the last time Defendant would follow up with Plaintiff about the reasonable accommodation request. Plaintiff responded on or around September 29th, 2021, asking for the second time if Plaintiff could bring medical documentation in person also noting that Plaintiff wasn't comfortable sharing more information until Plaintiff's complaints about hostility from management were addressed. Defendant responded to Plaintiff stating they'd be happy to resume the conversation at a later time, never acknowledging my complaints about management and never answering me about whether I could bring medical documentation in-peron.

The next business day, October 1st, 2021, Plaintiff's compensation was reduced 32 hours for the pay period of 9/20/21.

This happened immediately after Plaintiff insisted that HR recognize Plaintiff's complaint about management, where Plaintiff had complained about being threatened and intimidated when HR and management were on the same email chain. Once Defendant finally answered Plaintiff about the bench activities, Plaintiff resumed immediately, that same day, so the punitive escalation of the pay reduction was out of congruency with what Plaintiff was told. Additionally, because of the way they had set up the bench activities, there was nothing that Plaintiff missed, some weeks literally all of the activities were optional. Perhaps the worst though was that even after Plaintiff got connected to slack, some activities were posted on a different platform that plaintiff still didn't have access to. As soon as I got the work schedule from management, I reached out about the slack link, it was the management who didn't answer me, causing the delay.

Case 1:22-cv-01153-RDA-WBP   Document 55-2   Filed 07/18/24   Page 4 of 13 PageID# 410
Case 1:24-cv-00880-PTG-LRV   Document 1-1   Filed 05/24/24   Page 12 of 52 PageID# 20
Case 1:22-cv-01153-RDA-WBP   Document 39-2   Filed 10/27/23   Page 4 of 8 PageID# 277

4. Hostile Environment

Plaintiff has received medical treatment for a disability that restricts her ability to communicate and specifically impairs her use of vocal speech. Plaintiff told the Defendant she could bring medical documentation in person but Defendant never acknowledged this despite repeated attempts on Plaintiff's part. Before requesting a formal disability accommodation, Plaintiff graduated Defendant's training and completed work assignments from November 2020 until June 2021.. Plaintiff also earned two industry-level certifications on the subject matter of Plaintiff's work. Plaintiff also has an extensive activity profile on the subject matter of Plaintiff's previous position that shows Plaintiff is knowledgeable and has a strong foundation with hands on-work of the subject-matter.

. On July 26 Plaintiff had an interview with an accenture team that was looking for a permanent employee. This was a remote interview using Internet tools like Zoom or Microsoft Teams. These tools have the chat function as a standard feature. Before the interview started with Accenture, one of Defendants agents, a person who Plaintiff had no prior interaction with, joined the call and suggested Plaintiff couldn't do the interview. Plaintiff explained she was using text to talk instead of vocal speech because of a medical issue and the employee asked something to the effect of 'how do you expect to do the interview using text? Plaintiff explained that anything that can be said with vocal speech can be said with written words and this is especially true for coding jobs. Plaintiff further explained she'd already contacted the person interviewing her and there was no problem with it from their end. It was awful to have such a negative comment right before an interview.

On July 28, Defendant was notified by the client that Plaintiff's original client that Plaintiff had reported a discrimination complaint.

On July 29th, Defendant's manager described Plaintiff's medical condition as a "problem" , asking "how long you are gonna have this problem". At this point this manager stopped communicating with Plaintiff except to reject her portfolio for something that was already fixed (8/10) ,tell her that her panel was not clear because audio wasn't clear (10/5), and then to fire her (11/3). when the plaintiff reached out to this manager asking about day-to-day expectations , the manager never answered. This manager treated Plaintiff as if she was no longer an active employee between July 29th, 2021. and through September 2021.

It needs to be underscored that during training, staging, and project phases, if I didn't answer someone, even for 20 minutes , someone would be filling my mailbox with communications, and

Case 1:22-cv-01153-RDA-WBP Document 55-2 Filed 07/18/24 Page 5 of 13 PageID# 411
Case 1:24-cv-00880-PTG-LRV Document 1-1 Filed 05/24/24 Page 13 of 52 PageID# 21
Case 1:22-cv-01153-RDA-WBP Document 39-2 Filed 10/27/23 Page 5 of 8 PageID# 278

contacting me non-stop. I was in contact with people multiple times a day, everyday, so it was really a dramatic change when the manager stopped answering me.

When the manager told me my panel needed to be redone because audio wasn't clear, there was still no acknowledgement about the accommodation request. This was the same manager who told me that my impaired vocal speech was a problem. This manager knew that my vocal speech was impaired and that I was connected to HR about it. I even specifically tried to start the conversation asking if my accommodation request was why my panel hadn't been scheduled on July 29th but this was just ignored. Any genuine effort at an interactive discussion would have included that conversation. All of my communications about the panel went ignored until October 5th; that is more than 2 months and compare that to their written policy that says the panel should be completed within 8 days of entering the bench. The delay was excessive.

It was extra difficult because Defendant's HR refused to acknowledge Plaintiff's complaints about hostility from management even though Plaintiff reached out to HR on at least 4 (if not more) occasions between July 30, 2021 and the week of October 1, 2021. After my time sheet was rejected on October 1, 2021, and HR for the second time refused to acknowledge my request to bring medical documentation in person, and for at least the fourth time refused to acknowledge my complaints about management, I didn't know what else I could do to get them to engage with me because everything I tried didn't work.

When I got the job description about the fidelity job around October 14, 2021, I was so happy because one of the outlined questions of interest was about different communication styles. It was so upsetting to subsequently have the call with Defendant's employee because this employee just wanted to ask about the previous client (the one I'd reported discrimination to), and didn't mention anything about the practice questions that were outlined.

I used a voice enhancer microphone during the call and the Defendant's employee commented on it, asking about my voice, and I asked if what I was saying was audible and if we could proceed. The meeting proceeded but Defendant's employee didn't address any of the practice questions sent with the job description. After the meeting, I wrote to the Defendant's employee trying to highlight that I was hoping we could practice the questions that were listed on the job description before I went to the actual interview. The employee wrote back that he was praying for me and I wouldn't be interviewing because I wasn't a good fit. This was totally non-responsive about the practice of the questions. How would he know I wasn't a good fit if I didn't even get an opportunity to answer the practice questions? This was October 15, 2021.

5. Portfolio Rejection as Retaliation or Interference after Reporting "Abusive Behavior" to HR

July 29, 2021, Plaintiff asked a manager if her disability was the reason her panel had not yet been scheduled. This manager refused to answer but did refer her to HR. July 30, Plaintiff communicated with HR about the reasonable accommodation request, explaining she could do all the essential functions of her job, gave examples of how this could be done, and explained

Case 1:22-cv-01153-RDA-WBP   Document 55-2   Filed 07/18/24   Page 6 of 13 PageID# 412
Case 1:24-cv-00880-PTG-LRV   Document 1-1   Filed 05/24/24   Page 14 of 52 PageID# 22
Case 1:22-cv-01153-RDA-WBP   Document 39-2   Filed 10/27/23   Page 6 of 8 PageID# 279

her strengths. Plaintiff also on July 30th, specifically asked HR if her panel had not yet been scheduled because of the need for reasonable accommodation. Instead of engaging Plaintiff in any type of discussion, Defendant's HR provided no response for several weeks despite Plaintiff following up with HR multiple times during that time.

On August 9th, when she still hadn't heard anything back from anyone in HR about the reasonable accommodation request, or her manager about day-to-day responsibilities, despite reaching out multiple times to both parties, she received a 'panel invite' at 3:40pm that was open until 5:00pm, so zero notice and only open for the last hour of the day. On August 10th, Plaintiff wrote back, with management and HR copied, explaining that she needed HR to address concerns with some reasonable level of resolve and acknowledgement and she felt this was abusive. Further explaining, just as it would be unacceptable for me to disregard my ethical and legal obligations, it is similarly unacceptable for Revature staff to ignore legal and ethical obligations.

A few hours later, that manager sent Plaintiff a message that her portfolio was rejected. According to Defendant's policies, the portfolio approval was necessary for client eligibility. So, it was critical for Plaintiff's job. It felt like the portfolio rejection was punishment for speaking out against management, especially because the purported reason for the rejection was something that had already been discussed. Even when Plaintiff changed the portfolio again, this manager never issued the approval and the portfolio remained unapproved throughout the remainder of Plaintiff's employment.

Because the portfolio approval was necessary for client eligibility, this really caused Plaintiff extreme distress. When Plaintiff continuously tried out to this manager, even inquiring that if email wasn't the best way to connect they could schedule a live session, the manager never answered, just like the manager never answered Plaintiff when she reached out about day to day responsibilities. What's even worse is that email was the official method of communication per Defendant's policies.

Plaintiff ultimately reached out to HR about the portfolio rejection explaining she felt like her employment was threatened, that she felt like she was already fired because her manager wouldn't communicate with her, and that she was humiliated. This was August 24th, 2021 HR never acknowledged Plaintiff's complaints about this manager.

This is the manager who told Plaintiff her difficulty with vocal speech was a problem, later forced her to complete multiple panels because he said her audio wasn't clear, and ignored her communications about day-to-day responsibilities.

6. Forced use of all accrued vacation time and abnormally excessive delay in acknowledging timesheet concerns as Interference with Right to request Reasonable Accommodation

On July 30, 2021, Plaintiff wrote to Defendant's HR asking if she hadn't received a work schedule because of her disability. Plaintiff explicitly stated she was concerned because she understood the situation to be resulting in an entire week of lost pay as of that date.

Case 1:24-cv-01153-RDA-WBP Document 55-2 Filed 07/18/24 Page 7 of 13 PageID# 413
Case 1:24-cv-00880-PTG-LRV Document 1-1 Filed 05/24/24 Page 15 of 52 PageID# 23
Case 1:22-cv-01153-RDA-WBP Document 39-2 Filed 10/27/23 Page 7 of 8 PageID# 280

Despite several attempts on Plaintiff's part to follow up about this, the HR representative did not recognize Plaintiff's complaints about this until August 23, 2021. Usually Plaintiff would have been flooded with messages about requirements / meetings and time sheet submissions. All of this had stopped. Because Plaintiff's manager had also stopped responding to Plaintiff's direct communications after describing her disability as a problem, Plaintiff felt like she was already terminated. The fact that HR wouldn't even acknowledge her time sheets concerns made things worse.

Although the hours between August 1 2021, and August 23, 2021 were eventually processed, it was only after HR confronted me about reporting discrimination at the previous client. So the Defendant directly tied any acknowledgement of my accommodation request and my pay concerns to the fact that I reported discrimination at the previous client. Plaintiff initially reached out to HR about the hours on July 30th and followed up multiple times with no response until August 23, 2021. Nearly a month having gone by, I was feeling like they'd already terminated my employment. Additionally, I was never reimbursed for the hours for the week of July 26,2021. HR never acknowledged my concerns that I lost an entire week of pay that week. Defendant forced to use all of my accrued time off because management had stopped communicating with me, didn't answer when I asked about day-to-day expectations, and HR also never acknowledged the issue even though I brought it up several times.

7. The failure to respond to Plaintiff's repeated complaints about Plaintiff's supervisor Antony, as interference by not enforcing company policies about discrimination

On July 29, 2021, Antony described Plaintiff's disability as a problem and refused to answer her when she asked if that is why her panel had not been scheduled. On July 30, 2021 Plaintiff wrote to HR explaining she was concerned because she still hadn't received a work schedule. One week later, on August 6th, Plaintiff reached out to HR again explaining she still hadn't heard from her day-to-day manager, or the panel team.

Still no response, on August 10th, Plaintiff wrote to HR about "abusive behavior", demanding acknowledgement and resolution. Finally on August 16th, the HR representative wrote to Plaintiff, except that it wasn't to discuss anything Plaintiff had written to her about, it was to inform Plaintiff that Defendant was aware she complained about discrimination at the initial client. At this point, Plaintiff insisted her concerns be addressed before addressing a third party. On August 23, 2021, Plaintiff explained to HR that she hadn't been submitting hours because the staff never answered Plaintiff's communications. On August 26, 2021, Plaintiff reiterated to HR that she felt "constructively discharged" because the staff had stopped answering her even though she was consistently reaching out.

September 3, 2021, Plaintiff again reached out to HR explaining that she still had no work schedule, her portfolio remained unapproved, and she hadn't heard from anyone about the interactive discussion. The HR representative never answered this email.

Case 1:22-cv-01153-RDA-WBP Document 55-2 Filed 07/18/24 Page 8 of 13 PageID# 414
Case 1:24-cv-00880-PTG-LRV Document 1-1 Filed 05/24/24 Page 16 of 52 PageID# 24
Case 1:22-cv-01153-RDA-WBP Document 39-2 Filed 10/27/23 Page 8 of 8 PageID# 281

On September 7th, met with a new HR employee. When the meeting started, the new HR employee had no context for the meeting beyond that we were meeting to discuss a reasonable accommodation, even though I emailed this employee explaining the situation prior to the meeting. Plaintiff specifically named Antony as her manager, explaining he'd stopped answering her communications and she felt it was because of the accommodation request. During this September 7th meeting, Plaintiff also this was causing her extreme distress and that she wanted to work but was being forced to leave. More than a month had gone by.

Plaintiff's complaints continued and ultimately Plaintiff demanded that HR address hostility that Plaintiff was reporting. The last complaint that Plaintiff made to HR was on October 1st, when Plaintiff also again asked about bringing medical documentation in person, and Plaintiff never heard from that employee again.

Case 1:22-cv-01153-RDA-WBP Document 55-2 Filed 07/18/24 Page 9 of 13 PageID# 415
Case 1:24-cv-06830-PAC-LRV Document 1-2 Filed 05/24/24 Page 17 of 52 PageID# 25
Case 1:22-cv-01153-RDA-WBP Document 39-3 Filed 10/27/23 Page 1 of 36 PageID# 282

# Amended Attachement



Highlighting Quote from Accenture in Relation to My Job Qualifications

_Indeed


Reviews of Revature (A)

### 1.0 Great concept but extremely poor execution
★★★★★ Full Stack Developer (Former Employee) - Tampa, FL - April 29, 2021

> **Indeed Featured review**
> The most useful review selected by Indeed

My trainer was the most vague person I'd ever met. He should not have been a teacher or trainer of any sort. The hours were terrible, we had to work though every weekend on projects, there was no certainty that we'd be in the training program day to day, *no disability accommodations*, had to walk to work, pay was garbage. I do not recommend this job unless you are desperate for coding experience and have no other resources.

✓ Pros
    The training location in Tampa was beautiful

✗ Cons
    Pay, hours, trainer, very stressful and disorganized program

Was this review helpful?

    Yes 17    No                                                    ▶ Report   🔗 Share

_Indeed

Case 1:22-cv-01153-RDA-WBP Document 55-2 Filed 07/18/24 Page 11 of 13 PageID# 417
Case 1:24-cv-00880-PTG-LRV Document 1-1 Filed 05/24/24 Page 19 of 52 PageID# 27
Case 1:22-cv-01153-RDA-WBP Document 39-3 Filed 10/27/23 Page 3 of 36 PageID# 284

# Reviews of Revature

**1.0** ★☆☆☆☆

Feb 23, 2020

(B)

### Mistreatment of disabled veteran

 Anonymous Employee
Current Employee, less than 1 year

· Recommend   · CEO Approval   · Business Outlook

**Pros**
Paid training and get to move across the country

**Cons**
During training it puts an amount of stress that is hard to deal when you are disabled and having your performance rated sub par. Been threatened with termination before my ADA requests have been approved which seems inappropriate. I would have said something ▓▓▓▓▓▓▓▓ makes that hard now. There should be more help for people that are trying to get back into the workforce and into society. I also don't like when a characteristic of my disability effects my job rating.

**Advice to Management**
Take better care of disabled veterans and offer help to get them back on track then just try and throw them away when its convenient.

😊 9

Case 1:22-cv-01153-RDA-WBP Document 55-2 Filed 03/18/24 Page 12 of 13 PageID# 418
Case 1:24-cv-00880-PTG-ERV Document 1-1 Filed 05/24/24 Page 20 of 52 PageID# 28
Case 1:22-cv-01153-RDA-WBP Document 39-3 Filed 10/27/23 Page 4 of 36 PageID# 285

Reviews of Revature (C)

### 1.0 ★★★★★ Underpaid, Overworked
Cloud Developer (Former Employee) - Dallas, TX - March 31, 2023

**Indeed Featured review**
The most useful review selected by Indeed

I started at Revature because I was searching for employment at the beginning of COVID and they were one of the few employers to not take back their offer 20 March 2020.
I started off in a training bootcamp where I made minimum wage for eight hours a day and spent another twelve working on the training homework without pay.
The training was slightly less effective than college and I got less sleep that summer than I did in a standard college semester too. I was told that the overtime would stop once I finished training, but my Revature managers were always encouraging me to work extra hours and not tell the client that I was working with at the time.
***They also had no concerns for my health,*** which started deteriorating because of the long hours that were required. I have no issues with overtime if it's occasional and I'm either paid extra or working salary where it's agreed upon in advance. The issue I have is the fact that they didn't compensate for it and asked me and others to break labor codes, then threaten us with being fired if we told them we couldn't work the extra hours.

Was this review helpful?

Yes 7    No                                                    🚩 Report    🔗 Share

- Glass Door

Case 1:22-cv-01153-RDA-WBP Document 55-2 Filed 07/18/24 Page 13 of 13 PageID# 419
Case 1:24-cv-00880-PTG-ERV Document 1-1 Filed 05/24/24 Page 21 of 52 PageID# 29
Case 1:22-cv-01153-RDA-WBP Document 39-3 Filed 10/27/23 Page 5 of 36 PageID# 286



Sign in

# REVATURE

# Revature Hiring Event

Revature - Multiple Job Locations

## Virtual Hiring Event Details

**Interviews on the spot**

**Thursday, November 11, 2021**
**6:00 PM - 7:00 PM US/Eastern**

**Interviewing via web**
You'll receive an email on how to connect

**427 RSVPs so far**

**Interviewing for:**

**Entry Level Software Developer**
Full-time

Revature is the fastest growing employer of emerging technology talent.

One day someone is going to ask you where you got your start... This is IT!

With a wide range of Fortune 500 enterprises, government organizations and top systems integrators as our clients, we not only provide you with the skills needed to succeed through an employer-paid training program but will also give you the opportunity to put those skills to use, on projects that matter.

**What We Are Looking For**

- College degree (Associates or Bachelors)
- Must be authorized to work in the US
- Strong desire to learn to code – No prior professional experience required.
- A natural problem solver
- Strong communication and interpersonal skills